# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 01-2062

| | | |
|---|---|---|
| Equipment Manufacturers Institute, AGCO Corporation, Case Corporation, Deere & Company, New Holland North America, Inc., | * * * * * | |
| Plaintiffs/Appellants, | * * | |
| v. | * * | |
| William J. Janklow, Governor of the State of South Dakota, in his Official Capacity, and Mark W. Barnett, Attorney General of the State of South Dakota, in his Official Capacity, | * * * * * * | Appeal from the United States District Court for the District of South Dakota |
| Defendants/Appellees, | * * | |
| Farm Equipment Association of Minnesota and South Dakota, | * * * | |
| Intervenor Defendant/ Appellee. | * * | |

Submitted: November 15, 2001
Filed: August 6, 2002 **(Corrected 8/6/02)**

Before BYE and BEAM, Circuit Judges, and GOLDBERG,[1] Judge.

_____

GOLDBERG, Judge.

Plaintiffs-Appellants Equipment Manufacturers Institute ("EMI"), AGCO Corporation ("AGCO"), Case Corporation ("Case"), Deere & Company ("John Deere"), and New Holland North America, Inc. ("New Holland") (collectively the "Manufacturers"), filed a declaratory judgment action, through a complaint dated August 16, 1999, alleging that portions of the Act entitled "An Act to provide certain restrictions for dealership contracts for machinery" (the "Act") (1) violate the Contract Clauses of the United States and South Dakota Constitutions because they impair pre-existing dealership contracts; (2) are preempted by the Federal Arbitration Act; (3) are unconstitutionally vague in the use of the term "community"; and (4) otherwise violate substantive due process. The Manufacturers filed a motion for summary judgment on April 28, 2000. Defendants-Appellees, the Governor and Attorney General of South Dakota (the "State"), subsequently filed a cross-motion for summary judgment. The Farm Equipment Association of Minnesota and South Dakota ("FEA") intervened as a defendant in this action.

On March 30, 2001, the district court granted partial summary judgment in favor of the Manufacturers on their Contract Clause claim, ruling that the Act's restrictions on establishing new dealerships violated the Contract Clause. Equip. Mfrs. Inst. v. Janklow, 136 F. Supp. 2d. 991 (D.S.D. 2001). The district court also granted partial summary judgment in favor of the State on the remaining part of the Contract Clause claim, holding that the Act's restrictions on dealership termination were simply a "fine tuning" of pre-existing South Dakota law. The district court further granted summary judgment in favor of the Manufacturers on their preemption

_____

[1] The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

-2-

claim, and summary judgment in favor of the State on the void for vagueness and substantive due process claims, holding that the record established that the Act had been adopted to protect farmers, and that the Act bore a real and substantial relationship to the protection of farmers.

The Manufacturers appeal the district court's grant of partial summary judgment in favor of the State on the Contract Clause claim, and grant of summary judgment in favor of the State on the substantive due process claim.

We conclude that the district court erred in determining as a matter of law that the restrictions on dealership termination of South Dakota Codified Laws § 37-5-14, 1999 S.D. Laws Ch. 200, § 2 ("Section 2"), do not violate the Contract Clause. This Court finds that as a matter of law, Section 2 is a substantial impairment on pre-existing contractual relationships, and that there is no legitimate and significant public purpose. As a result, Section 2 is an unconstitutional burden on pre-existing dealership agreements under the Contract Clause. The grant of partial summary judgment in favor of the State by the district court is reversed, and the Manufacturers' motion for summary judgment is granted. Ordinarily, an order denying summary judgment (which by implication occurred here) may not be appealed until completion of the case below. However, in certain instances, we may exercise jurisdiction over "pendent" issues:

> [A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on an interlocutory appeal–that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well.

Kincade v. City of Blue Springs, 64 F.3d 389, 394 (8th Cir. 1995) (quoting Moore v. City of Wynnewood, 57 F.3d 924, 930 (10th Cir. 1995)). In reviewing the district court's grant of summary judgment to the State, we have resolved in the

Manufacturer's favor every issue raised by its motion for partial summary judgment. Accordingly, we invoke our pendent jurisdiction and grant the Manufacturer's motion. Because we grant summary judgment in favor of the Manufacturers on the Contract Clause claim, we do not address the Manufacturers' substantive due process claim regarding pre-existing dealership contracts. We affirm the district court's disposition of the Manufacturers' substantive due process claims regarding future dealership contracts.

## I.    BACKGROUND

Plaintiff-Appellant EMI is a trade association consisting of 141 manufacturers of agricultural, construction, forestry, materials handling, and utility equipment. Many of EMI's members enter into individual contractual relationships with dealers whom they have determined are qualified to market and service their machinery to consumers in specified markets. Plaintiffs-Appellants AGCO, Case, John Deere, and New Holland are manufacturers of agricultural equipment, and members of EMI. The relationships between the manufacturers and dealers are governed by dealership agreements, which establish the respective rights and duties of each party and the essential structure of the business relationship between them.

Sections 37-5-1, 37-5-2, and 37-5-3 of the South Dakota Codified Laws, in force since 1951, make it a Class 1 misdemeanor for a manufacturer "to coerce or attempt to coerce" a dealer to take certain actions, or to cancel a dealership agreement "unfairly, without due regard to the equities of the dealer and without just provocation." S.D. CODIFIED LAWS §§ 37-5-1 to 3 (2001), 1951 S.D. Laws Ch. 262, § 1. These protections were augmented by the passage of the Act, which took effect on July 1, 1999.[2] S.D. CODIFIED LAWS §§ 37-5-13 to 15 (2001), 1999

---

[2] The challenged portion of the Act under the Contract Clause is Section 2, codified at § 37-5-14. Section 37-5-13 defines the terms in § 37-5-14, and § 37-5-15,

S.D. Laws Ch. 200. Section 2 sets forth five circumstances that do not constitute cause for termination of a dealership contract.

> The following circumstances are not cause for the termination or discontinuance of a dealership contract, nor for entering into a dealership contract for the establishment of an additional dealership in a community for the same line-make:
>
> (1) The change of executive management or ownership of the dealer, unless the manufacturer can show that the change would be detrimental to the representation or reputation of the manufacturer's product;
>
> (2) Refusal by the dealer to purchase or accept delivery of any machinery, parts, accessories, or any other commodity or service not ordered by the dealer unless such machinery, parts, accessories, or other commodity or service is necessary for the operation of machinery commonly sold in the dealer's area of responsibility;
>
> (3) The sole fact that the manufacturer desires further penetration of the market;
>
> (4) The fact that the dealer owns, has an investment in, participates in the management of, or holds a dealership contract for the sale of another line-make of machinery, or that the dealer has established another line-make of machinery in the same dealership facilities as those of the manufacturer, if the dealer maintains a reasonable line of credit for each line-make of machinery; or
>
> (5) Refusal by the dealer to participate in any national advertising campaign or contest or purchase any promotional materials, display devices, or display decoration or materials which are at the expense of the dealer.

---

by its terms, can not apply to pre-existing contracts. Footnote 8 of the Manufacturer's Brief mentions a challenge to § 37-5-15(3) under the substantive due process claim, but this Court will not consider a claim improperly presented in a footnote. Falco Lime, Inc. v. Tide Towing Co., 29 F.3d 362 (8th Cir. 1994).

S.D. C<small>ODIFIED</small> L<small>AWS</small> § 37-5-14, 1999 S.D. Laws Ch. 200, § 2.

AGCO, Case, John Deere, New Holland, Komatsu America International Company ("Komatsu"), and Gehl Company ("Gehl"), manufacturers of machinery as defined by the Act, SDCL § 37-5-13(4), 1999 S.D. Laws Ch. 200, § 1, are active members of EMI.[3] EMI member companies have "dealership contracts" with South Dakota "dealers," as those terms are defined by the Act. S.D. C<small>ODIFIED</small> L<small>AWS</small> §§ 37-5-13(1), (2), 1999 S.D. Laws Ch. 200, § 1. Each of the aforementioned EMI members has dealership agreements with dealers in South Dakota; specifically, AGCO has 59, Case has 33, Deere has 24, New Holland has 22, Gehl has 10, and Komatsu has one dealer located in South Dakota. See Appellants' Separate Appendix ("Appellants' App.") 76, 99, 121, 139, 185, 206. Each of the manufacturers reports that a substantial number of their relationships with South Dakota dealers are governed by dealership agreements in existence before July 1, 1999, the effective date of the Act ("pre-existing dealership agreements"). Id. at 76, 99, 121, 139, 185, 207.

## II.    DISCUSSION

This Court reviews the district court's grant of summary judgment *de novo*, and applies the same standards as did the district court. Wildman v. Marshalltown Sch. Dist., 249 F.3d 768, 771 (8th Cir. 2001); Educational Employees Credit Union v. Mut. Guar. Corp., 50 F.3d 1432, 1436 (8th Cir. 1995). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a ruling in its favor as a matter of law. Fed. R. Civ. P. 56(c); Jensen v. Taco John's Int'l, 110 F.3d 525, 527 (8th Cir. 1997).

---

[3] Komatsu America International Company and Gehl Company, are not plaintiffs or appellants here, but as members of EMI their dealership agreements and affidavits are relevant to this case.

The central question to this appeal is whether Section 2 of the Act entitled "An Act to provide certain restrictions for dealership contracts for machinery," impermissibly impairs dealership agreements between manufacturers and South Dakota dealers that were in effect prior to July 1, 1999. On appeal, the Manufacturers argue that Section 2 impairs the obligations within the pre-existing dealership agreements in violation of the Contract Clauses of the South Dakota and United States Constitution. Under South Dakota law, the determination of whether a statute violates the Contract Clause is the same under both the South Dakota and United States Constitutions. S.D. CONST. art. VI, § 12; Engelcke v. Farmers' State Bank, 246 N.W. 288, 290, 61 S.D. 92 (S.D. 1932). Therefore, the Court's analysis focuses on the Contract Clause of the United States Constitution, which provides: "No State shall . . . pass any . . . Law impairing the Obligations of Contracts." U.S. CONST. art. I, § 10.

The test to determine if a statute violates the Contract Clause has three parts:

(1) The first inquiry is whether the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships. Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S. Ct. 697, 704 (1983); Educational Employees Credit Union, 50 F.3d at 1438. If there is no substantial impairment on contractual relationships, the law does not violate the Contract Clause. If, however, the law does constitute a substantial impairment, the second part of the test is addressed:

(2) The State must have a "significant and legitimate public purpose behind the regulation." Educational Employees Credit Union, 50 F.3d at 1438, Energy Reserves Group, 459 U.S. at 412, 103 S. Ct. at 705 ("The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests."). If there is no significant and legitimate public purpose, the state law is unconstitutional under the Contract Clause. Id. If a

-7-

significant and legitimate public purpose has been identified, the third part of the test is applied:

(3) This Court must determine "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" Energy Reserves Group, 459 U.S. at 412, 103 S. Ct. at 705 (quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 22, 97 S. Ct. 1505, 1518 (1977)).

## A.    Section 2 of the Act is a Substantial Impairment on Pre-existing Dealership Agreements

The first part of the Contract Clause test is whether Section 2 of the Act substantially impairs pre-existing dealership agreements. In General Motors Corp. v. Romein, 503 U.S. 181, 112 S. Ct. 1105 (1992), the Supreme Court set forth a three-part test to determine whether a substantial impairment of a contractual relationship exists. This "inquiry has three components: [1] whether there is a contractual relationship, [2] whether a change in law impairs that contractual relationship, and [3] whether the impairment is substantial." Id. at 186, 112 S. Ct. at 1109 (holding there was no contractual relationship regarding the statutory terms at issue, and therefore no violation of the Contract Clause). In the current case the first component is clearly satisfied, as neither party disputes that contracts between the manufacturers and dealers exist.[4] It remains, then, to determine whether Section 2 impairs the pre-

---

[4] The Manufacturers submitted to the district court Dealership Agreements for AGCO (Appellants' App. 82-97), Case (Appellants' App. 105-19), John Deere (Appellants' App. 128-37), New Holland (Appellants' App. 146-62), Gehl (Appellants' App. 189-205), and Komatsu (Appellants' App. 212-39). The State does not dispute that these are true and correct copies, Appellees' App. 274-76; the State also submitted the Dealership Agreement signed in 1985 between Case and Van Der Werff Implement (Appellees' Separate Appendix ("Appellees' App.") 212-20).

existing dealership contracts, and whether that impairment is substantial.

### 1.    Section 2 of the Act is an Impairment on Dealership Agreements

The second component of the inquiry into whether there is a substantial impairment of a contractual relationship is to find the contractual rights that are impaired. "In assessing the validity of [the Manufacturers'] Contracts Clause claim in this case, we begin by identifying the precise contractual right that has been impaired . . . ." Keystone Bituminous Coal Ass'n. v. DeBenedictis, 480 U.S. 470, 504, 107 S. Ct. 1232, 1251-52 (1987). In other words, before the Court can determine whether the impairment is substantial, it must first identify what contractual rights, if any, have been impaired. The Manufacturers contend, and this Court agrees, that several contractual terms within the pre-existing dealership agreements have been impaired, including: (a) terms governing a change in dealership executive management or ownership; (b) terms about dealers' stocking machinery parts and accessories; (c) terms covering the manufacturer's attempts to further penetrate the market; (d) terms regarding a dealer's sale of another line-make of machinery; and (e) terms about required dealer participation in advertising and promotional activities.

### a.    Dealership Agreement Terms Governing a Change in Dealership Executive Management or Ownership

All of the dealership contracts before this Court contain language prohibiting a dealer from selling the dealership, or changing executive management, without approval by the manufacturer.[5] Under Section 2(1) of the Act, a manufacturer does

_____

[5] See, e.g., AGCO dealership agreement, Appellants' App. 89 (permitting termination if there is a "change in the partners of Dealer," or "change in the shareholders or principal officers of Dealer," or "[a]ny significant change in the management structure of Dealer"); Case dealership agreement, Appellants' App. 110 (Case will give "good faith consideration" to any plan to alter control or ownership

not have cause to terminate a dealership contract if there is a "change of executive management or ownership of the dealer, unless the manufacturer can show that the change would be detrimental to the representation or reputation of the manufacturer's product." S.D. CODIFIED LAWS § 37-5-14(1), 1999 S.D. Laws Ch. 200, § 2(1).

### b. Dealership Contract Terms Regarding Dealers' Stocking Machinery Parts and Accessories

All of the dealership contracts at issue contain language requiring the dealer to maintain an adequate stock, as determined by the manufacturer, of parts and accessories.[6] Under Section 2(2) of the Act, a manufacturer does not have cause to

---

of the dealership, but if Case does not consent to the plan and the plan is still implemented, the dealership agreement "shall terminate immediately."); accord 1985 J I Case Company Agricultural Dealer Agreement with Van Der Werff Impl, Inc., Appellee's App. 215; John Deere dealership agreement, Appellants' App. 131 (permitting termination upon "[w]ithdrawal of an individual proprietor, partner, major shareholder, or the manager of the dealership or a substantial reduction in interest of a partner or major shareholder, without the prior written consent of the Company"); New Holland dealership agreement, Appellants' App. 146, 160 (giving the manufacturer "sole discretion to approve or disapprove any proposed change in dealer ownership or managerial authority," and any disapproved change is grounds for immediate termination of the dealership agreement); Gehl dealership agreement, Appellants' App. 196 (permitting immediate termination upon "any change in the principal officers, directors, [or] management" of the dealer "without the written consent of [Gehl]"); Komatsu dealership agreement, Appellants' App. 229-30 (the manufacturer can terminate the dealership agreement immediately if there is "any sale, transfer or relinquishment . . . of any interest . . . [in] ownership or control of the [dealer], which effects a material change in the operation, management or control of the [dealer]").

[6] See, e.g., AGCO dealership agreement, Appellants' App. 85 (dealer agrees to "order, stock, prominently display, and promote a representative sample of each type of Product applicable to Dealer's trade area"); Case dealership agreement, App.

terminate a dealership contract if the dealer refuses to "purchase or accept delivery of any machinery, parts, accessories, or any other commodity or service not ordered by the dealer unless such machinery, parts, accessories, or other commodity or service is necessary for the operation of machinery commonly sold in the dealer's area of responsibility." S.D. CODIFIED LAWS § 37-5-14(2), 1999 S.D. Laws Ch. 200, § 2(2).

### c. Dealership Contract Terms Covering Manufacturers' Attempts to Further Penetrate the Market

All of the dealership contracts proffered by Plaintiffs-Appellants contain language which allows a manufacturer to terminate a dealership contract for the sole reason that the manufacturer desires further penetration of the market.[7] Under

_____

107 (dealer agrees to "maintain an inventory . . . adequate in relation to the sales and service potential for such area"); John Deere dealership agreement, Appellants' App. 24 (dealer required to "to maintain an inventory of Goods in proportion to the sales possibilities in [his area of responsibility]" and to maintain "[s]ervice equipment, an adequate stock of service parts and those appropriate special tools"); New Holland dealership agreement, Appellants' App. 154 (dealer required to maintain "stocks of PRODUCTS of an assortment and in quantities adequate to meet the current and anticipated demand therefor"); Komatsu dealership agreement, Appellants' App. 224 (dealer must "maintain an inventory of the Products in keeping with the sales possibilities of the Territory").

[7] See, e.g., AGCO dealership agreement, Appellants' App. 87 (dealer agrees to represent AGCO by "utilizing its best efforts to obtain and retain an appropriate market share for AGCO"); Case dealership agreement, Appellants' App. 106 (requires dealers to "[p]romote and sell Products sufficient to achieve . . . a share of the market satisfactory to the Company"); John Deere dealership agreement, Appellants' App. 130 (dealers required to achieve market penetration satisfactory to John Deere); New Holland dealership agreement, Appellants' App. 153 (requires dealers to "obtain . . . a reasonable share of the total market comprised of PRODUCTS and products of other manufacturers that compete with PRODUCTS"); Gehl dealership agreement, Appellants' App. 193 ("The Dealer shall provide

Section 2(3) of the Act, a manufacturer does not have cause to terminate a dealership contract, or establish a new dealership in the original dealer's community for the same line-make, for "[t]he sole fact that the manufacturer desires further penetration of the market." S.D. CODIFIED LAWS § 37-5-14(3), 1999 S.D. Laws Ch. 200, § 2(3).[8]

### d. Dealership Contract Terms Regarding a Dealer's Sale of Another Line-Make of Machinery

Two of the dealership agreements are terminable if the dealer does not comply with the conditions of selling another line-make of machinery.[9, 10] Under Section 2(4) of the Act, a manufacturer does not have cause to terminate a dealership contract if:

---

satisfactory sales performance" and evaluation will be based (in part) on "the market penetration."); Komatsu dealership agreement, Appellants' App. 193 (dealers agree to "achieve a reasonable share of the market for all or any portion of the Products").

[8] As stated earlier in this opinion, the district court found that the portion of the SDCL which restricted a manufacturer from establishing a new dealership in the original dealer's community was unconstitutional. The State did not appeal that determination.

[9] An example of a dealership selling another line-make of machinery would be a dealership that sells both John Deere and Komatsu machinery.

[10] The AGCO dealership agreement requires that "in no event will the Product display of [AGCO's] Products be less desirable than that furnished by Dealer to competitive product lines." Appellants' App. 85. John Deere requires that

> [i]f the Dealer undertakes to carry another major product line or engage in another major business activity, either of which involves an important commitment of effort and resources, the Dealer agrees to make such separation of the personnel, facilities, capital and other resources devoted to that business as is satisfactory to the Company.

Appellants' App. 130.

the dealer owns, has an investment in, participates in the management of, or holds a dealership contract for the sale of another line-make of machinery, or that the dealer has established another line-make of machinery in the same dealership facilities as those of the manufacturer, if the dealer maintains a reasonable line of credit for each line-make of machinery.

S.D. CODIFIED LAWS § 37-5-14(4), 1999 S.D. Laws Ch. 200, § 2(4).

> ### e.      Dealership Contract Terms Regarding Required Dealer Participation in Advertising and Promotional Activities

Several of the dealership agreements contain specific provisions that set forth the dealer's responsibilities concerning advertising and sales promotion activities.[11] Under Section 2(5) of the Act, a manufacturer does not have cause to terminate a dealership contract if the dealer refuses "to participate in any national advertising campaign or contest or purchase any promotional materials, display devices, or display decoration or materials which are at the expense of the dealer." S.D. CODIFIED LAWS § 37-5-14(5), 1999 S.D. Laws Ch. 200, § 2(5).

---

[11] See, e.g., AGCO dealership agreement, Appellants' App. 87 (dealers agree "to maintain suitable display areas for Products and to use AGCO sales promotion and advertising programs"); New Holland dealership agreement, Appellants' App. 154, 158 (requires dealers to "acquire, erect and maintain signs of good appearance" and "conduct aggressive advertising and sales promotion activities, making use of the greatest reasonable extent the Company's advertising, sales promotion and merchandising programs and materials"); Komatsu dealership agreement, Appellants' App. 224, 227 (requires dealers to "use the promotional and advertising materials and services made available by the Company and to advertise the Products as provided for in the Agreement" and "at its cost [to] advertise the Products in the Territory through appropriate advertising media and display and demonstrate the Products at industrial or trade fairs, exhibitions and shows and to good prospective customers in the Territory").

As outlined above, Section 2 of the Act impairs specific contractual rights contained in the pre-existing dealership agreements. Therefore, the second component for determining whether the dealership agreements are substantially impaired by Section 2 of the Act is satisfied.

## 2.    The Impairments on Pre-existing Dealership Agreements by Section 2 of the Act are Substantial

The third component of the inquiry for determining whether the dealership agreements are substantially impaired is to ascertain whether Section 2 of the Act "has, in fact, operated as a substantial impairment of a contractual relationship." Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411, 103 S. Ct. 697, 704 (1983) (quoting Allied Structural Steel Co. v. Spannus, 438 U.S. 234, 244, 98 S. Ct. 2716, 2722 (1978)). This Court will consider "the extent to which the [parties'] reasonable contract expectations have been disrupted" to determine whether the impairment is substantial. In re: Workers' Compensation Refund, 46 F.3d 813, 819 (8th Cir. 1995).[12] "In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." Energy Reserves Group, 459 U.S. at 411, 103 S. Ct. at 704. The impairment does not need to be total, but the more severe the impairment, the closer

---

[12] In Allied Structural Steel Co., the Supreme Court explained why contract expectations are important:

> The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

438 U.S. at 245, 98 S.Ct. at 2723.

scrutiny the statute will receive.  <u>Allied Structural Steel Co.</u>, 438 U.S. at 245, 98 S.Ct. at 2723, <u>United States Trust Co. v. New Jersey</u>, 431 U.S. 1, 26-27, 97 S. Ct. 1505, 1515 (1977), <u>Workers' Compensation Refund</u>, 46 F.3d at 819.  Therefore, to analyze the nature of the impairment, we (a) first set forth the nature of the impairment produced by each subsection of Section 2 of the Act on the pre-existing dealership agreements; and then (b) consider how previous regulation affects the extent of the impairment.

### a.      The Nature of the Impairment

#### i.      Section 2(1) of the Act

Under all the dealership contracts before this Court, the dealer has the burden of proving to the manufacturer the fitness of a prospective owner or manager of a dealership.[13]   Any change in ownership or executive management without the manufacturer's approval is cause for termination of the dealership agreement.  <u>See</u> <u>supra</u> n.5.  Section 2(1) of the Act shifts that burden to the manufacturer, requiring it to "show that the change would be detrimental to the representation or reputation of the manufacturer's product."  S.D. CODIFIED LAWS § 37-5-14(1), 1999 S.D. Laws Ch. 200, § 2(1).  Shifting the burden to the manufacturer substantially impairs the terms of the pre-existing dealership agreement, especially given the special nature of the relationship between dealers and manufacturers.  Among the distinctive features typical of that relationship are the credit that manufacturers extend to dealers; intangible factors manufacturers use in choosing dealers; and the extensive degree to which dealers represent the manufacturers to the public.  <u>See</u> Appellees' Separate Appendix ("Appellees' App.") 277-79.

---

[13]    The State asserts that previous regulation would not have allowed manufacturers to enforce the contractual terms. Appellees' App. 280. We address this argument <u>infra</u> at Part II(A)(2)(b).

The identity of the owner or executive management of the dealership is important to the manufacturer because, as the State acknowledges, many manufacturers provide machinery to dealers on credit. See Appellees' App. 277-78. A manufacturer reasonably may be concerned that a mismanaged dealership will sell the machinery, provided on credit, and fail to reimburse the manufacturer. For this reason, manufacturers routinely place the burden on dealers to show that a change in ownership or management of the dealership would not be injurious to the manufacturer's interests. See supra n.6.

Shifting the burden from the dealers to the manufacturers is a significant impairment on the contractual terms of the pre-existing dealership agreements because manufacturers consider many tangible and intangible factors to evaluate the fitness of dealers, not solely whether the dealers are a detriment to the representation of the manufacturers' products. See Appellees' App. 278-79; accord Appellants' App. 123, 208 ("In no case is the evaluation limited to a determination of whether transferring the management or ownership of a distributorship to a particular candidate would be 'detrimental to the representation or reputation' of Komatsu products."). To evaluate prospective dealers, manufacturers typically consider factors such as experience in agricultural and other equipment sales; financial status; development of a business, personnel and marketing plan; management talent; willingness to be involved in the day-to-day operations of the dealership; dedication, character, trustworthiness, personality, energy, enthusiasm, intelligence, customer relations skills, and similar qualities; competency of staff; business acumen; and commitment to the manufacturer's products. See Appellees' App. 278, accord Appellants' App. 77-78, 102 ("Case's evaluation of dealer prospects is based substantially on subjective and intangible determinations that would make any showing of detriment difficult and, moreover, it is unclear to us just how detrimental the dealer prospect would have to be under the Act."), 122-24, 140-42, 185-87, 207-09. Manufacturers conduct this extensive review of potential dealers because if the dealership becomes insolvent, the manufacturer's reputation in the community may

suffer and its customers may be left without a local dealership for repairs and parts. Cf. Appellees' App. 10 (manufacturers entrust dealers with "significant responsibility for marketing, selling and servicing the companies' products").

Therefore, assuming that Section 2(1) of the Act was not reasonably foreseeable, infra Part II(A)(2)(b), manufacturers' contract expectations about their control of the representatives of their products are substantially disrupted under Section 2(1) of the Act. See McDonald's Corp. v. Nelson, 822 F. Supp. 597, 600, 605-07 (S.D. Iowa 1993) (pre-existing franchise agreements were substantially impaired by the Iowa Franchise Act, in part because it shifted the burden to franchisors to show that prospective franchisees could not satisfy the "reasonable current qualifications" as set out in the franchise agreements), aff'd *sub nom.*, Holiday Inns Franchising, Inc. v. Branstad, 29 F.3d 383 (8th Cir. 1994). Section 2(1) of the Act is therefore a substantial burden on the contractual rights of manufacturers under the pre-existing dealership agreements. See Workers' Compensation Refund, 46 F.3d at 819.

### ii. Section 2(2) of the Act

Section 2(2) of the Act prohibits a manufacturer from terminating a dealership contract if the dealer does not purchase or accept any machinery, parts, or other product or service not ordered by the dealer, unless it is "necessary for the operation of machinery commonly sold in the dealer's area of responsibility." S.D. CODIFIED LAWS § 37-5-14(2), 1999 S.D. Laws Ch. 200, § 2(2). Dealers agreed to stock more than what Section 2(2) requires in the pre-existing dealership agreements. See supra n.6. Thus, manufacturers' contract expectations under Section 2(2) are significantly impaired, in part because a dealer is often the sole representative and sales and service outlet for customers and potential customers in a given area. See Appellees' App. 15-16; accord Appellants' App. 102-03, 124-26, 142, 207. The manufacturers are reasonably concerned that without the ability to require dealers to purchase certain

machinery, the manufacturers' products would not be represented in certain areas to their fullest potential.

It is also important to manufacturers' contract expectations that dealers be required to stock a full range of parts and service equipment because prompt service is important to farmers. The State acknowledges that the current inventory of farm machinery on South Dakota farms is "aged and requires adequate facilities for repair and servicing equipment." Appellees' App. 5, 160-61, 193. Thus, it is important that parts and service equipment are available to promptly repair machinery in order to enhance the manufacturer's reputation with customers and potential customers. See Appellees' App. 277, 282-84. Therefore, assuming that Section 2(2) of the Act was not reasonably foreseeable, infra Part II(A)(2)(b), Section 2(2) of the Act substantially impairs the contractual rights of manufacturers under the pre-existing dealership agreements.

### iii.    Section 2(3) of the Act

Under the pre-existing dealership agreements, unsatisfactory market penetration alone was grounds for termination of the dealership agreement. See supra n.7. Section 2(3) of the Act, however, prohibits the manufacturer from using the market penetration measure as the sole reason for dealer termination. S.D. CODIFIED LAWS § 37-5-14(3), 1999 S.D. Laws Ch. 200, § 2(3). The Manufacturers point out that market penetration is an easily quantified proxy for dealer performance, and that dealer termination for poor market penetration is permissible under all the pre-existing dealership agreements. Appellants' App. 80, 103-04, 126-27, 143, 187, 210-11. The State does not dispute this claim, except to argue that pre-existing regulation in South Dakota would not have allowed the manufacturers to enforce contract clauses which allowed termination for poor market penetration.[14]  See Appellees'

---

[14]  This argument is addressed infra at Part II(A)(2)(b).

App. 288-89 (citing Appellees' App. 196-97, 201). Section 2(3) of the Act limits the manufacturers' ability to ensure that dealers are using their best efforts to sell and service the products. So long as Section 2(3) of the Act was not reasonably foreseeable, infra Part II(A)(2)(b), it substantially impairs manufacturers' rights under the pre-existing dealership agreements.

iv.     Section 2(4) of the Act

Section 2(4) of the Act provides that a dealer's participation in the ownership or management of a dealership contract for the sale of another line-make of machinery cannot be the sole grounds for the manufacturer to terminate the dealership contract, unless the dealer does not maintain a reasonable line of credit for each line-make of machinery. S.D. CODIFIED LAWS § 37-5-14(4), 1999 S.D. Laws Ch. 200, § 2(4). Clauses in pre-existing contracts typically permit manufacturers to terminate dealers who begin dealing in another line-make of machinery. See supra n.10. Manufacturers' concerns with dealers selling other line-makes of machinery are not limited to whether the dealer has a reasonable line of credit for each line-make of machinery. Rather, they are concerned that dealers will not devote enough sales staff, service equipment, service personnel, showroom space, and advertising efforts to the individual manufacturer's line-make of machinery. See Appellants' App. 80-81, 104, 125-26, 144. Since dealers are often the sole representative of the manufacturer in a region, manufacturers are reasonably concerned that their products will not be effectively represented to the consumers in that sales area, absent contractual limitations on the ability of dealers to represent other line-makes. See Appellees' App. 282-83 (admitting that a dealer is frequently the manufacturer's sole representative in an area). By not allowing manufacturers to terminate dealers who undertake to represent another line-make of machinery, Section 2(4) of the Act substantially impairs the manufacturers' rights under the pre-existing dealership agreements, provided that Section 2(4) of the Act was not reasonably foreseeable. See infra Part II(A)(2)(b).

-19-

v.     Section 2(5) of the Act

Section 2(5) of the Act prohibits a manufacturer from terminating a dealership agreement solely because the dealer refuses to participate in any national advertising campaign or purchase any promotional materials, that are at the expense of the dealer. S.D. CODIFIED LAWS § 37-5-14(5), 1999 S.D. Laws Ch. 200, § 2(5).  Three of the pre-existing dealership agreements before this Court include provisions outlining dealers' responsibilities for sales promotion and advertising activities.  See supra n.11. Manufacturers develop their advertising and promotion programs based on dealers' participation in the programs, and manufacturers use dealer advertising and promotion involvement to gauge whether dealers are using their best efforts to promote the manufacturers' products.  See Appellants' App. at 81, 104, 144-45, 211. The State does not dispute manufacturers' reliance on dealer participation in advertising and promotion activities.[15]  Section 2(5) is a substantial impairment on the pre-existing dealership agreements because it realigns the contract rights between manufacturers and dealers, assuming that Section 2(5) of the Act was not reasonably foreseeable, infra Part II(A)(2)(b).

**b.     The Impairment was not Foreseeable**

The second step in analyzing the nature of Section 2 of the Act's impairment on pre-existing dealership agreements is to ascertain whether previous regulation affects the nature of the impairment, i.e., whether the impairment was foreseeable. Although Section 2 of the Act substantially impairs the contractual rights bargained for in the pre-existing dealership agreements, supra Part II(A)(2)(a), if previous regulation of the relationship between manufacturers and dealers made the terms of

_____

[15]  The State asserts that previous regulation would not have allowed manufacturers to enforce this contractual term.  Appellees' App. 292 (citing Appellees' App. 196-97, 201).  This argument is addressed infra at Part II(A)(2)(b).

Section 2 of the Act foreseeable, then Section 2 of the Act does not substantially impair the pre-existing dealership agreements in violation of the Contract Clause. In re: Workers' Compensation Refund, 46 F.3d 813, 819 (8th Cir. 1995). Parties' expectations of future regulation are important in determining whether contractual rights are substantially impaired because parties bargained for terms in the contract based on those expectations; if those expectations were fulfilled, the Court will not now relieve parties of their obligations.[16] Cf. Energy Reserves Group, 459 U.S. at 411, 103 S. Ct. at 704.

In the current case, agricultural machinery manufacturer-dealer relationships were previously regulated. These regulations, in force since 1951, made it a Class 1 misdemeanor for manufacturers "to coerce or attempt to coerce" a dealer to take certain actions, or for a manufacturer to cancel a dealership agreement "unfairly, without due regard to the equities of the dealer and without just provocation."[17] S.D.

---

[16] In Energy Reserves Group, Inc., the Supreme Court placed importance on previous regulation of the industry because if contractual rights are already subjected to regulation, then further regulation is foreseeable. 459 U.S. at 411, 103 S. Ct. at 704.

[17] The three relevant statutory regulations in force since 1951 provide as follows:

> It is a Class 1 misdemeanor for any manufacturer, . . . to coerce or attempt to coerce any dealer in . . . farm tractors; or farm implements, to purchase or accept delivery of any motor vehicle or vehicles, parts or accessories therefor or any other commodity which has not been ordered by such dealer or threatening to cancel or terminate any franchise, agency, arrangement, or agreement existing between such manufacturer, . . . and such dealer or by any other unfair means or by duress of any kind.

S.D. CODIFIED LAWS § 37-5-1, 1951 S.D. Laws Ch. 262, § 1.

-21-

CODIFIED LAWS §§ 37-5-1 to 3, 1951 S.D. Laws Ch. 262, § 1.[18] However, the 1951 statutes, unlike Section 2 of the Act, do not regulate terms of a contract.

The State argues that even if sections 37-5-1 through 37-5-3 did not put the manufacturers on notice that there would be future regulation of the type in Section 2 of the Act, section 37-5-12 did. That section, which dates to 1991, prohibits

---

> It is a Class 1 misdemeanor for any manufacturer, . . . to coerce or attempt to coerce any dealer in . . . farm tractors; or farm implements, to enter into any agreement with such manufacturer, . . . or to assign, sell, or dispose of any contract or property in any way, or to expend any money or do any other act unfair to such dealer; by threatening to cancel or terminate any franchise, agency, arrangement, or agreement existing between such manufacturer, . . . and such dealer or by any other unfair means or by duress of any kind.

S.D. CODIFIED LAWS § 37-5-2, 1951 S.D. Laws Ch. 262, § 1.

> It is a Class 1 misdemeanor for any manufacturer, . . . unfairly, without due regard to the equities of the dealer and without just provocation, to cancel the franchise of any dealer in . . . farm tractors; or farm implements.

S.D. CODIFIED LAWS § 37-5-3, 1951 S.D. Laws Ch. 262, § 1.

[18] Section 37-5-3 does not require coercion or duress on the part of the manufacturer to find that the manufacturer improperly terminated the dealer, and thus committed a misdemeanor. However, the South Dakota Supreme Court has ruled that section 37-5-3 allows a manufacturer to terminate a dealer for "some sort of misconduct or shortcoming on the part of the dealer," which plainly includes breach of contract by the dealer. Groseth Int'l, Inc. v. Tenneco, Inc., 410 N.W.2d 159 (S.D. 1987). Since a manufacturer could terminate a dealer for not fulfilling a contractual obligation under section 37-5-3, we disagree with the dissent's conclusion that manufacturers were on notice that contractual provisions were subject to state regulation.

contract provisions which waive compliance with Chapter 37-5.[19]  S.D. CODIFIED LAWS § 37-5-12, 1991 S.D. Laws Ch. 319, § 2.  Section 37-5-12 establishes an equitable remedy for violations of Chapter 37-5, in addition to the criminal sanctions, by providing that any contractual provision purporting to waive compliance with Chapter 37-5 is void.  The State's argument fails, however, because section 37-5-12 does not realign the rights of manufacturers and dealers under pre-existing dealership agreements, as does Section 2 of the Act.  Cf. Allied Structural Steel Co. v. Spannus, 438 U.S. 234, 245, 98 S. Ct. 2716, 2723 (1978).

Thus, previous regulations were not sufficiently pervasive to destroy the contract expectations of the manufacturers.

In addressing the question of the foreseeability of future regulation, the Supreme Court has focused on whether previous regulation was in the area of the future regulation.   In Allied Structural Steel Co., the Court considered the constitutionality of a Minnesota pension regulation as applied to pre-existing contracts.  438 U.S. at 245, 98 S.Ct. at 2723.  The Court found that, although the plaintiff company's pre-existing pension plan had been previously subject to regulation by the IRS, it had not previously been regulated in the area covered by the Minnesota regulation.  Id.  For that reason, the Court held the Minnesota regulation unconstitutional as applied to the plaintiff's company, as it had no reason to anticipate that the terms of the pension plan would be altered by subsequent legislation. Similarly, in the instant case, the 1951 regulations prevent manufacturers from taking

_____

[19]  Section 37-5-12 provides as follows:

Any condition, stipulation or provision in any agreement evidenced by a franchise agreement, sales agreement, security agreement, or other form of agreement or arrangement of like effect, purporting to waive compliance with any provision of this chapter, or other provision of state law applying to such agreements is void as a matter of public policy.

S.D. CODIFIED LAWS § 37-5-12, 1951 S.D. Laws Ch. 262, § 1.

actions outside the obligations and rights of the dealership agreement, by coercion, duress, or acting unfairly. In contrast, Section 2 of the Act purports to place extensive limitations on freely-negotiated arrangements, and thus exceeds what the manufacturers could have reasonably anticipated in light of the previous South Dakota regulation.

In Workers' Compensation Refund, this Court also found substantial impairment in the context of the heavily-regulated workers' compensation insurance industry. 46 F.3d at 819-20. We agreed that "[h]eavy regulation of an industry may reduce reasonable expectations. However, regulation does not automatically foreclose the possibility of contract impairment. . . . We find that Minnesota's regulation of excess reinsurance premiums has not been sufficiently pervasive so as to destroy all reasonable contractual expectations." Id. at 820. As in that case, this Court finds that the previous state regulation at issue here was not "sufficiently pervasive so as to destroy all reasonable contractual expectations" by the manufacturers. Id.

Therefore, because the pre-existing dealership agreements are impaired, and because this substantial impairment was not foreseeable, this Court finds that the first part of the Contract Clause test is answered in the affirmative: Section 2 of the Act substantially impairs pre-existing dealership agreements. The second part of the Contract Clause test must now be addressed, to ascertain whether there is a significant and legitimate public purpose for Section 2 of the Act.

**B.** **There is No Significant and Legitimate Public Purpose for Section 2 of the Act**

Because a substantial impairment of pre-existing contractual rights exists, South Dakota must demonstrate a significant and legitimate public purpose underlying the Act. Workers' Compensation Refund, 46 F.3d at 820. The State must

show that the regulation protects a "broad societal interest rather than a narrow class." Allied Structural Steel Co. v. Spannus, 438 U.S. 234, 249, 98 S. Ct. 2716, 2724 (1979). The State bears the burden of proof in showing a significant and legitimate public purpose underlying the Act. "[I]f a State undertakes to alter substantially the terms of a contract, it must justify the alteration, and the burden that is on the State varies directly with the substantiality of the alteration." White Motor Corp. v. Malone, 599 F.2d 283, 287 (8th Cir. 1979).

There is no statement of legislative intent or any other legislative history from which to directly ascertain the purpose of the Act.[20] The State's *post hoc* rationalization is that the Act benefits a broad social interest: serving the farmer and rural communities in South Dakota. Such an interest is unquestionably significant and legitimate, see Farmers Union Oil Co. v. Allied Products Corp., 162 B.R. 834, 840-41 (D.N.D. 1993), and we would be compelled to uphold the Act if we credited the State's rationale for the Act. Cf. Workers' Compensation Refund, 46 F.3d at 821. The State's evidence contradicts this asserted broad social interest, however, in several aspects. First, the State has produced no evidence of the harm to be avoided by passage of the Act. See McDonald's, 822 F. Supp. at 609 (allegations that unfair practices can harm consumers, without more, do not sufficiently allege harm for Contract Clause analysis purposes); Equipment Mfrs. Inst. v. Janklow, 136 F. Supp. 2d. 991, 1000 (D.S.D. 2001) (finding no evidence of the asserted purpose to protect farmers and rural communities regarding the Act's restrictions on manufacturers establishing new dealerships). The alleged harm is that termination of dealers by manufacturers will result in loss of jobs, hardship on farmers required to travel farther for equipment and repairs, and the consequent acceleration of the decline of rural communities and farms. See Appellees' App. 5-9, 159-60. But the State has produced no evidence that manufacturers currently, or will in the future, prohibit sales

---

[20] According to the State's Amended Answer, no statement of legislative purpose or findings is required in South Dakota legislation. Appellees' App. 263.

of dealerships, require dealers to maintain inventories of machinery and parts inappropriate for the dealers' area, prohibit the sale of additional line-makes by dealers, terminate dealers for inadequate market penetration, or terminate dealers for refusing to participate in advertising activities.[21] While the State cites to a decrease in the number of farmers and farms, it does not cite to evidence that there has been or will be an actual decrease in the number of farm equipment dealers, let alone tie such a decrease in farms and farmers to the restrictions contained in extant dealership agreements. But see Appellees' App. 188 (growth in nonfarm economy contributes to decrease in the number of farmers); 189 (advances in technology contributed to a decrease in the number of South Dakota farms). The decline in the number of farmers has little to do with the number of equipment dealers.

Second, both the State and the Defendant-Intervenor concede that the Act's purpose is to level the playing field between manufacturers and dealers. See Appellees' App. 10 ("[I]t assists in leveling the playing field between manufacturers and dealers."), 196 ("It imparts a degree of security and predictability to relations between dealers and manufacturers."). However, leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest.[22] See Allied Structural Steel, 438 U.S. at 247. See also McDonald's Corp.

---

[21] In fact, the evidence tends to indicate quite the opposite behavior by manufacturers during the time that dealership agreements with the sort of provisions that the Act would outlaw have been in force. The dealers who submitted affidavits to the district court represent multiple lines, and a majority of dealers throughout South Dakota have been in existence for more than 25 years. See Appellees' App. 206 (dealer indicates he sells thirteen lines of equipment), 248 (dealer sells three lines of equipment), 255 (dealer carries four lines of equipment), 6 (64 percent of dealers have been dealers for more than 25 years, 85 percent have been dealers for more than 15 years).

[22] The State and Defendant-Intervenor extensively complain in their Joint Statement of Material Facts and affidavits that the relationship between manufacturer and dealer was once a "personal agreement" based on "trust and an economically

v. Nelson, 822 F. Supp. 597, 608 (S.D. Iowa 1993), aff'd sub nom. Holiday Inns Franchising, Inc. v. Brandstad, 29 F.3d 383 (8th Cir. 1994).

Third, the sparse legislative history reinforces that the suspect purpose of the Act is to directly change the obligations of the manufacturers and dealers, as illustrated by its title, "An Act to provide certain restrictions for dealership contracts for machinery." Appellees' App. 36. Cf. Whirlpool Corp. v. Ritter, 929 F.2d 1318, 1323 (8th Cir. 1991) ("Because the law at issue here directly alters the obligations and expectations of the contracting parties, it is not merely general, social legislation."). Fourth, any claim that its purpose is to benefit farmers and rural communities is belied by the fact that only implement dealers and manufacturers attended committee hearings on the Act, and the record contains no evidence of farmers' participation. Appellees' App. 54, 70, 88-89.

It is clear that the only real beneficiaries under the Act are the narrow class of dealers of agricultural machinery. See Appellees' App. 13 ("Dealers are the principal class of persons protected by [the Act].class"), 157-61, 190-201. As the case law makes clear, such special interest legislation runs afoul of the Contract Clause when it impairs pre-existing contracts. In McDonald's Corp. v. Nelson, 822 F. Supp. 597, the court determined that there was no significant and legitimate public purpose for the Iowa Franchise Act. The court based its conclusion on an affidavit of the President of the Iowa Senate, which articulated the legislature's study of franchising and development of the Iowa Franchise Act. The Senate, according to the affidavit, heard

_____

balanced relationship," and has morphed into a "one-sided economic relationship[ ]" implemented through a "one-sided form dealership agreement[ ]." Appellees' App. 5-9; accord Appellees' Brief 4-5, Appellees' App. 193-94, 206-07, 248-49, 255-56. Whether true or not, such allegations cannot justify legislative interference in private contracts. There is no broad public policy interest in readjusting contractual rights and obligations in pre-existing contracts. Whirlpool Corp. v. Ritter, 929 F.2d 1318, 1323 (8th Cir. 1991).

testimony that franchising was a growing industry in Iowa, and that "the unfair practices of some franchisors can harm Iowa franchises, consumers, and other businesses." McDonald's Corp., 822 F. Supp. at 608. A review of the record developed for purposes of summary judgment showed that the primary purposes of the Iowa Franchise Act were to equalize bargaining power and protect franchisees from abuses by franchisors. The district court then contrasted valid laws under the Contract Clause, which advanced a "broad social interest," with invalid laws that "directly adjusted the rights and responsibilities of contracting parties." Id. at 608 (internal quotation marks omitted), quoting Exxon Corp. v. Eagerton, 462 U.S. 176, 191-92, 103 S. Ct. 2296, 2306 (1983). In the instant case, as in McDonald's, the suspect purpose of the legislation at issue is to directly adjust the rights and responsibilities of dealers and manufacturers under the pre-existing dealership agreements, not to advance a broad social interest.

Without evidence of a significant and legitimate public purpose underlying Section 2 of the Act, Section 2 is void as applied to dealership agreements in existence before July 1, 1999. Therefore, the Court does not need to address the last step of Contract Clause analysis, whether the adjustment of contract rights is appropriate to the public purpose. Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 412, 103 S. Ct. 697, 705 (1983). Because we grant summary judgment to the Manufacturers on the Contract Clause claim, we need not address their substantive due process claims in regards to pre-existing dealership contracts. With respect to the Manufacturers' claims that the Act's application to future dealership contracts violates their substantive due process rights, the Court concludes that the Manufacturers have not met their burden of proof to establish a violation of the United States or South Dakota Constitutions' due process clauses, and thus affirms the disposition of these claims by the district court. See Wellwood v. Johnson, 172 F.3d 1007, 1010-11 (8th Cir. 1999); Crowley v. State, 268 N.W.2d 616, 618 (S.D. 1978) (Under South Dakota Constitution's due process clause analysis, "[a]ll presumptions are in favor of the constitutionality of a statute and this continues

-28-

until the contrary is shown beyond a reasonable doubt."); <u>State v. Nuss</u>, 79 S.D. 522, 526, 114 N.W.2d 633, 635 (1962).

## III.  CONCLUSION

For all the foregoing reasons, this Court finds and concludes that Section 2 of the Act entitled "An Act to provide certain restrictions for dealership contracts for machinery," is not based on a significant and legitimate public purpose, sufficient to justify the substantial impairment that its provisions have on dealership agreements in effect prior to the Act's effective date.  The grant of partial summary judgment of the district court on the Contract Clause claim is reversed, and the Manufacturers' motion for summary judgment is granted.  The grant of partial summary judgment of the district court on the substantive due process claims is affirmed.

BYE, Circuit Judge, dissenting.

Although South Dakota's new law impairs contracts, as the majority holds, I believe the impairment was foreseeable to equipment manufacturers. For that reason, I respectfully dissent.

An impairment is not substantial in a field where prior regulation existed and new legislation "was foreseeable as the type of law that would alter contract obligations." <u>Energy Reserves Group, Inc. v. Kan. Power & Light Co.</u>, 459 U.S. 400, 416 (1983).  "The idea . . . is that if the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed." <u>Holiday Inns Franchising, Inc. v. Branstad</u>, 29 F.3d 383, 385 (8th Cir. 1994).

Since 1951, South Dakota has prohibited manufacturers from terminating dealerships "unfairly, without due regard to the equities of the dealer and without just provocation."  S.D. Codified Laws § 37-5-3.  All provisions in dealership contracts

which purport to waive compliance with § 37-5-3 are void. S.D. Codified Laws § 37-5-12. Thus, manufacturers have long been on notice that their dealership contract terms, at least those terms relating to termination, were subject to state regulation. See Groseth Int'l, Inc. v. Tenneco, Inc., 410 N.W.2d 159, 168 (S.D. 1987) (interpreting § 37-5-3 and holding that the "just provocation" standard "requires some sort of misconduct or shortcoming on the part of the dealer," and rejecting the manufacturer's argument it could meet the standard where a termination was in good faith). The restrictions on dealership termination now found at § 37-5-14 merely fine-tune those existing regulations, providing specific circumstances under which a termination will be considered unfair and without just cause. I am therefore unable to conclude that the provisions of § 37-5-14 pertaining to termination violate the Contract Clause.

In reaching this conclusion, I find persuasive the reasoning of the Seventh Circuit in Chrysler Corp. v. Kolosso Auto Sales, Inc., 148 F.3d 892 (7th Cir. 1998). Wisconsin had a longstanding statute prohibiting auto manufacturers from terminating auto dealerships "unfairly, without due regard to the equities of said dealer and without just provocation." Wis. Stat. § 218.01(3)(a)(17) (enacted in 1937, renumbered at § 218.0116(1)(i) by 1999 Act 31, §§ 14 to 283, eff. April 19, 2000). In 1993, Wisconsin amended the law to (1) allow a dealer to challenge a manufacturer's refusal to allow the dealer to relocate, and (2) create a specific procedure for resolving relocation disputes. See Wis. Stat. § 218.01(3x) (renumbered at § 218.0134(3)(a) by 1999 Act 31, §§ 14 to 283, eff. April 19, 2000). In 1995, when Kolosso Auto Sales informed Chrysler it wanted to move its dealership, Chrysler sued to enforce a provision in the dealership contract that forbid Kolosso from relocating without Chrysler's permission, and to declare the new law invalid under the Contract Clause. Kolosso, 148 F.3d at 893.

The Seventh Circuit held the 1993 amendment did not violate the Contract Clause. The court noted Wisconsin had interpreted the pre-existing law's "just

provocation" clause "to forbid termination without good cause." <u>Id.</u> at 896. The court reasoned the pre-existing law would have prevented Chrysler from terminating Kolosso for moving the dealership without permission, absent good cause, and the new law merely specified that a manufacturer could not terminate a dealer for an unauthorized relocation unless it followed the new procedures for resolving relocation disputes.

> Chrysler should have known . . . that it did not have a solid right to prevent a dealer from changing the location of the dealership, that it was operating in a grey area of the dealership law, that the law might some day be amended to regulate disputes over relocation specifically, and that if this happened it might not be able to get the amendment struck down under the contracts clause.

<u>Id.</u> at 897.

Here, the district court correctly concluded § 37-5-14's specific provisions on termination "are simply particular applications of the general standard in § 37-5-3 [and] the substantive changes effected by the Dealership Act at issue in this case are not so different from the changes in <u>Kolosso</u> as to impose a substantial impairment under the Contract Clause." <u>Equip. Mfrs. Inst. v. Janklow</u>, 136 F. Supp. 2d 991, 1000 (D.S.D. 2001). Because § 37-5-14's impairment on existing contracts was foreseeable, it is unecessary to address whether the legislation serves a significant and legitimate public purpose.

I would affirm the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT