Merrimack
Nos. 2014-0315
 2014-0441
 2014-0575

DEERE & COMPANY & a.

v.

THE STATE OF NEW HAMPSHIRE

KUBOTA TRACTOR CORPORATION

v.

THE STATE OF NEW HAMPSHIRE

HUSQVARNA PROFESSIONAL PRODUCTS, INC.

v.

THE STATE OF NEW HAMPSHIRE

Argued: September 10, 2015
Opinion Issued: December 29, 2015

*Nixon Peabody LLP*, of Manchester (*Kevin M. Fitzgerald, Gordon J. MacDonald,* and *Anthony J. Galdieri* on the brief, and *Mr. MacDonald* orally), for petitioners Deere & Company, CNH America LLC, and AGCO Corporation.

*CullenCollimore, PLLC*, of Nashua (*Brian J.S. Cullen* and *Shelagh C.N. Michaud* on the brief, and *Mr. Cullen* orally), for petitioner Kubota Tractor Corporation.

*McLane Middleton, Professional Association*, of Manchester (*Michael A. Delaney* on the brief), and *Thompson Hine LLP*, of Cleveland, Ohio (*Thomas J. Collin* and *Jennifer S. Roach* on the brief, and *Mr. Collin* orally), for petitioner Husqvarna Professional Products, Inc.

*Joseph A. Foster*, attorney general (*Francis C. Fredericks*, assistant attorney general, on the brief and orally), for the respondent, the State of New Hampshire.

*Holmes Law Offices PLLC*, of Concord (*Gregory A. Holmes* on the brief and orally), for the intervenor, Frost Farm Service, Inc.

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Jason R.L. Major* and *Charles G. Douglas, III* on the brief), for Association of Equipment Manufacturers, as *amicus curiae.*

*Upton & Hatfield, LLP*, of Portsmouth (*Russell F. Hilliard* on the brief), for Northeast Equipment Dealers Association, and *Peter J. McNamara*, of Concord, by brief, for New Hampshire Automobile Dealers Association, as *amici curiae.*

*Kelly Law PLLC*, of Nashua (*James D. Kelly* on the brief), and *Kelley Drye and Warren*, of Washington, D.C. (*William Guerry* and *Shaun Gehan* on the brief), for Outdoor Power Equipment Institute, as *amicus curiae.*

DALIANIS, C.J. In these consolidated appeals, the petitioners, Deere & Company (Deere), CNH America LLC (CNH), AGCO Corporation (AGCO), Kubota Tractor Corporation (Kubota), and Husqvarna Professional Products, Inc. (Husqvarna), appeal orders of the Superior Court (*Smukler*, J.) granting summary judgment to the respondent, the State of New Hampshire, on the petitioners' constitutional challenges to Senate Bill (SB) 126. We affirm in part, vacate in part, and remand.

*I. Brief Factual Summary*

The pertinent facts follow. SB 126, enacted in 2013, amended RSA chapter 357-C to define "motor vehicle" as including "equipment," which "means farm and utility tractors, forestry equipment, industrial equipment, construction equipment, farm implements, farm machinery, yard and garden equipment, attachments, accessories, and repair parts." Laws 2013, 130:1 (quotations omitted); *see* RSA 357-C:1, I (Supp. 2015); *see also STIHL, Inc. v. State of N.H.*, 168 N.H. 335 (2015) (concluding that the statutory definition of motor vehicle, as amended by SB 126, pertains to equipment that is analogous to automobiles, that is, equipment with an engine, wheels, and a transmission). Because of this amendment, manufacturers, distributors, and dealers of such equipment are, for the first time, subject to the New Hampshire Motor Vehicle Franchise Act, RSA chapter 357-C. *See STIHL, Inc.*, 168 N.H. at 335; *see also* RSA ch. 357-C (2009 & Supp. 2015).

Like its federal counterpart and similar state statutes, RSA chapter 357-C, "the so-called 'dealer bill of rights,'" *STIHL, Inc.*, 168 N.H. at 333, was enacted "to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 101 (1978) (discussing such laws in general); *see id.* at 100-01 n.4 (quoting Congressional report that gave rise to the federal legislation); *see also Roberts v. General Motors Corp.*, 138 N.H. 532,

536 (1994). As first enacted in 1981, RSA chapter 357-C provided motor vehicle dealers certain protections from the actions of manufacturers. *See* Laws 1981, ch. 477; *see also STIHL, Inc.*, 168 N.H. at 333. Over time, the legislature increased the level of regulation by, for instance, creating the New Hampshire Motor Vehicle Industry Board (Board) to enforce the statute, *see* Laws 1996, 263:8, and expanding the definition of motor vehicle to include off highway recreational vehicles, *see* Laws 2002, 215:4, and snowmobiles, *see* Laws 2007, 372:3. *See STIHL, Inc.*, 168 N.H. at 337.

RSA chapter 357-C regulates, among other things, a manufacturer's delivery and warranty obligations and termination of dealership agreements. *See* RSA 357-C:4 (2009), :5, :7 (Supp. 2015). RSA chapter 357-C also defines unfair methods of competition and deceptive practices. *See* RSA 357-C:3 (Supp. 2015). Violation of any provision of RSA chapter 357-C constitutes a misdemeanor. *See* RSA 357-C:15 (2009).

Among other safeguards, RSA chapter 357-C "protects the equities of existing dealers by prohibiting" motor vehicle "manufacturers from adding dealerships to the market areas of its existing franchisees where the effect of such intrabrand competition would be injurious to the existing franchisees and to the public interest." *New Motor Vehicle Bd. of Cal.*, 439 U.S. at 101 (describing California Automobile Franchise Act, a law similar to RSA chapter 357-C); *see* RSA 357-C:9 (Supp. 2015). To enforce this prohibition, RSA chapter 357-C requires a motor vehicle manufacturer that seeks to establish a new motor vehicle dealership or relocate an existing new motor vehicle dealership "within a relevant market area where the same line make is then represented," to give written notice of such intention to the Board and to "each new motor vehicle dealer of such line make in the relevant market area." RSA 357-C:9, I; *see New Motor Vehicle Bd. of Cal.*, 439 U.S. at 103 (describing California Automobile Franchise Act). RSA chapter 357-C defines the "[r]elevant market area" as "any area within the town or city where the motor vehicle dealer maintains his place of business or the area, if any, set forth in a franchise or agreement, whichever is larger." RSA 357-C:1, XXI (2009). If a new motor vehicle dealership protests to the Board within a statutorily defined period of time, the Board then holds a hearing to determine whether there is "good cause," as statutorily defined, for "not permitting such new motor vehicle dealership." RSA 357-C:9, I; *see* RSA 357-C:9, II, III. Among the factors to consider when determining whether "good cause" exists are: (1) "[a]ny effect on the retail new motor vehicle business and the consuming public in the relevant market area," RSA 357-C:9, II(b); (2) whether establishing an additional new dealership "is injurious or beneficial to the public welfare," RSA 357-C:9, II(c); and (3) whether establishing an additional dealership "would increase competition, and therefore be in the public interest," RSA 357-C:9, II(e).

As the legislature expanded RSA chapter 357-C, it also enacted RSA chapter 347-A, a similar but less comprehensive regulatory scheme providing protections to equipment dealers. *STIHL, Inc.*, 168 N.H. at 333; *see* Laws 1995, ch. 210. RSA chapter 347-A regulated: (1) the termination of dealer agreements; (2) a supplier's duty upon termination of such an agreement; (3) the terms for repurchasing inventory upon termination of such an agreement and exceptions thereto; (4) a dealer's right to transfer its business; (5) warranty obligations; and (6) the obligation of a successor in interest. *See* RSA 347-A:2-:6, :8, :11 (2009) (repealed 2013). Unlike RSA chapter 357-C, RSA chapter 347-A did not include an administrative enforcement mechanism, provide for criminal penalties, impose statutory limits upon the ability of a manufacturer to establish or relocate a dealership, or specify the methods of competition and practices that were deemed unfair and deceptive. *See* RSA ch. 347-A (2009) (repealed 2013).

When the legislature, through SB 126, amended the definition of "motor vehicle" in RSA chapter 357-C to bring certain equipment manufacturers and dealers within the aegis of that chapter, it also repealed RSA chapter 347-A. *STIHL, Inc.*, 168 N.H. at 333; *see* Laws 2013, ch. 130. SB 126 became effective in September 2013. Laws 2013, 130:19.

In August 2013, Deere, CNH, and AGCO, collectively referred to as the Deere petitioners, sued the State for declaratory and injunctive relief related to SB 126. The Deere petitioners manufacture agricultural, construction, forestry, industrial, lawn, and garden equipment, including commercial mowers, wheel loaders, backhoes, and agricultural tractors. Their complaint alleges that: (1) retroactive application of SB 126 substantially impairs their existing dealership agreements in violation of the State and Federal Contract Clauses; and (2) SB 126 violates the Supremacy Clause of the Federal Constitution because it voids or otherwise renders unenforceable mandatory binding arbitration clauses in existing dealership agreements, thereby conflicting with the Federal Arbitration Act (FAA). Thereafter, the Deere petitioners obtained a court order that preliminarily enjoined the State "from including farm and equipment manufacturers within the definition of motor vehicles" in RSA chapter 357-C "as provided for under SB 126." In October 2013, the trial court granted intervenor status to Frost Farm Service, Inc., an equipment dealer and franchisee of AGCO.

The Deere petitioners and the State subsequently filed cross-motions for summary judgment. In April 2014, the trial court granted the State's motion and denied the Deere petitioners' motion, concluding that the Deere petitioners had "not sustained their burden of showing that SB 126 unconstitutionally impairs existing contracts." The court observed that the Deere petitioners had identified "ten substantial SB 126 impairments," but

that "[n]ot all of the [identified] impairments . . . apply to each of the contracts in question." Ultimately, the court concluded that, although including the Deere petitioners "within the purview of RSA [chapter] 357-C has created added requirements by which [they] must act, such additions represent refinements in the law," and do not constitute substantial impairments of their existing contracts. For example, the court observed, although RSA chapter 357-C requires that a dealership agreement may not be terminated except upon "good cause," RSA chapter 347-A contained a similar mandate. RSA 357-C:7, I(c); *see* RSA 347-A:2, I. Under RSA chapter 347-A, a dealership agreement could not be terminated "without cause" and "cause" was defined as "failure by an equipment dealer to comply with requirements imposed upon the equipment dealer by the dealer agreement," provided that those requirements were not substantially different from those imposed upon other similarly situated dealers. *Id.*

The trial court further concluded that, even if SB 126 substantially impaired the Deere petitioners' existing contracts, their contract clause claim failed because SB 126 serves the legitimate and significant public purpose of safeguarding consumer interests and "constitutes broad-based economic legislation that is directed to meet a societal need." However, the court agreed with the Deere petitioners that, as applied to equipment manufacturers, portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III violate the Supremacy Clause because they conflict with, and are preempted by, the FAA. Nonetheless, the court rejected their argument that those provisions are so integral to RSA chapter 357-C that they are not severable. The Deere petitioners appeal the trial court's decision. The trial court stayed its summary judgment order pending the instant appeal.

Shortly before the court ruled upon the summary judgment motions in the Deere action, Husqvarna brought its own action challenging the constitutionality of SB 126. Husqvarna manufactures forestry, lawn and garden equipment, including mowers, garden tractors, and snow throwers, which it sells through more than 40 independent dealers in New Hampshire. In addition to alleging counts for unconstitutional impairment of contract and violation of the Supremacy Clause, Husqvarna alleges that SB 126 violates the Equal Protection and dormant Commerce Clauses of the Federal Constitution.

Thereafter, Husqvarna and the State filed cross-motions for summary judgment. In August 2014, the trial court granted the State's motion and denied Husqvarna's motion. Husqvarna appeals the trial court's order. The trial court stayed application of SB 126 to Husqvarna pending final disposition of this appeal.

In April 2014, Kubota brought its own action against the State, alleging a single count — that SB 126 substantially impairs its existing dealer agreements in New Hampshire in violation of the State and Federal Contract Clauses. Kubota describes itself as "a long standing distributor of construction, farm, and lawn equipment." In June 2014, Kubota and the State filed a joint motion for a final order asking the trial court to confirm that the final order it had entered in the Deere action applied to Kubota. The trial court granted the motion and stayed application of the Deere order to Kubota pending the resolution of Kubota's appeal.

## II. Analysis

On appeal, all petitioners argue that SB 126 violates the State and Federal Contract Clauses. See N.H. CONST. pt. I, art. 23; U.S. CONST. art. I, § 10, cl. 1. The Deere petitioners and Husqvarna assert that SB 126 also offends the Supremacy Clause. See U.S. CONST. art. 6, cl. 2. Finally, Husqvarna contends that SB 126 violates the federal Equal Protection Clause, see U.S. CONST. amend. XIV, and the dormant Commerce Clause, see U.S. CONST. art. I, § 8, cl. 3. We first address the petitioners' claims under the State and Federal Contract Clauses and then address claims arising only under the Federal Constitution. "Throughout, we keep in mind the elementary rule that every reasonable construction must be resorted to in order to save a statute from unconstitutionality." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir. 2005) (quotation, brackets, and ellipses omitted). We confine our analysis to the questions raised on appeal and do not otherwise opine upon the wisdom and reasonableness of the legislature's decision to amend RSA chapter 357-C by defining "motor vehicle" to include "equipment." RSA 357-C:1, I. "The wisdom and reasonableness of the legislative scheme are for the legislature, not the courts, to determine." Blackthorne Group v. Pines of Newmarket, 150 N.H. 804, 810 (2004).

### A. Standards of Review

"In reviewing the trial court's rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." Bovaird v. N.H. Dep't of Admin. Servs., 166 N.H. 755, 758 (2014) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. (quotation omitted). "We review the trial court's application of the law to the facts de novo." Id. (quotation omitted).

We review the trial court's statutory interpretation *de novo*. *Id.* On questions of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *Eby v. State*, 166 N.H. 321, 341 (2014). We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* at 341-42.

We review the constitutionality of a statute *de novo*. *Am. Fed'n of Teachers-N.H. v. State of N.H.*, 167 N.H. 294, 300 (2015). "The party challenging a statute's constitutionality bears the burden of proof." *Id.* (quotation omitted). "In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds." *Id.* (quotation omitted). "In other words, we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." *Id.* (quotation omitted). Thus, a statute will not be construed to be unconstitutional when it is susceptible of a construction rendering it constitutional. *Id.* "When doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality." *Id.* (quotation omitted).

## B. Contract Clauses

The petitioners' primary contention is that SB 126 violates the State and Federal Contract Clauses because it substantially impairs their existing New Hampshire dealership agreements. Part I, Article 23 of our State Constitution provides that "[r]etrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses." N.H. CONST. pt. I, art. 23. The Contract Clause of the Federal Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. CONST. art. I, § 10, cl. 1. Although Part I, Article 23 does not expressly reference existing contracts, "we have held that its proscription duplicates the protections found in the contract clause of the United States Constitution." *State v. Fournier*, 158 N.H. 214, 221 (2009) (quotation omitted). "The Federal and State Constitutions offer equivalent protections where a law impairs a contract, or where a law abrogates an earlier statute that is itself a contract." *Id.* (quotation omitted). We first address the petitioners' arguments under the State Constitution and rely upon federal law only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

The threshold inquiry in a contract clause analysis is whether the law has a retroactive effect upon an existing contract. *Fournier*, 158 N.H. at 218

(explaining that in "testing legislation against Part I, Article 23," we first "discern whether the legislature intended the law to apply retroactively," and, if so, "we then inquire whether such retroactive application is constitutionally permissible"). Here, the parties do not dispute that the legislature intended SB 126 to apply retroactively. Accordingly, we assume for the purposes of this appeal that such is the case and confine our analysis to the remaining elements of the petitioners' claim of a contract clause violation.

■ When evaluating a contract clause claim, a court must determine "whether a change in state law has resulted in the substantial impairment of a contractual relationship." *Am. Fed'n of Teachers-N.H.*, 167 N.H. at 301 (quotation omitted). "This inquiry, in turn, has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Id.* (quotation omitted).

■ To survive a contract clause challenge, a legislative enactment that constitutes a substantial impairment of a contractual relationship " 'must have a significant and legitimate public purpose.' " *Id.* (quoting *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 411 (1983)); *see Tuttle v. N.H. Med. Malpractice Joint Underwriting Assoc.*, 159 N.H. 627, 653 (2010) (using the phrases "important public purpose" and "significant and legitimate public purpose" interchangeably). "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group*, 459 U.S. at 412; *see Tuttle*, 159 N.H. at 642 (explaining that "the core task involved in resolving Contract Clause claims" is "striking a balance between constitutionally protected contract rights and the State's legitimate exercise of its reserved police power").

■ Once a significant and legitimate public purpose is identified, the next inquiry

> is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Unless the State itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.

*Energy Reserves Group*, 459 U.S. at 412-13 (quotation, brackets, citations, and ellipsis omitted); *cf. Tuttle*, 159 N.H. at 653-55 (determining that traditional deference to legislature's judgment as to necessity and reason-

ableness of challenged law was unwarranted, even though State was not a contracting party, because State's financial self-interest was at stake).

■ Although, with regard to some of their challenges, it is questionable whether SB 126 substantially impairs the petitioners' existing agreements with their New Hampshire dealers, for the purposes of this appeal, we assume that it does. Nevertheless, we conclude that SB 126 does not violate the State and Federal Contract Clauses because it has a "significant and legitimate public purpose" and because the legislature's "adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose" justifying the adoption of SB 126. *Energy Reserves Group*, 459 U.S. at 412 (quotation and brackets omitted).

### 1. Significant and Legitimate Public Purpose

■ SB 126 was enacted to provide to equipment dealers the same level of protection provided to automobile dealers under RSA chapter 357-C. *See* N.H.H.R. JOUR. 765 (May 22, 2013). The legislature deemed such protection necessary because it considered the "relationship between equipment dealers and manufacturers" to be "identical to that [between] car/truck dealers" and car/truck manufacturers. *Id.* The legislature determined that "[e]quipment dealers . . . have business operations that are nearly identical in all respects to car/truck/motorcycle etc. dealers." *Id.* The legislature further found that equipment dealership agreements, like automobile dealership agreements, had been "one-sided" and reflected that the dealers and manufacturers had "an autocratic relationship." *Id.* The legislature was concerned that manufacturers shifted costs "onto dealers and ultimately consumers" through the use of such "one-sided, non-negotiable contracts." *Id.* It concluded that equipment manufacturers, like automobile manufacturers previously, "were abusing their power in the relationship" and that New Hampshire "businesses and consumers were being harmed as a result." *Id.*

■ The purpose of SB 126 — to protect equipment dealers and consumers from perceived abusive and oppressive acts by manufacturers — is unquestionably a significant and legitimate public purpose. *See New Motor Vehicle Bd. of Cal.*, 439 U.S. at 101. As the United States Supreme Court explained when examining a substantive due process challenge to the California Automobile Franchise Act, a state legislature is "empowered to subordinate the franchise rights of [motor vehicle] manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or

oppressive trade practices." *Id.* at 107. The Court specifically identified "the promotion of fair dealing and the protection of small business" as valid state interests. *Id.* at 102 n.7.

Numerous federal and state courts, addressing constitutional challenges to laws similar to RSA chapter 357-C, have concluded that protecting dealers and consumers from the oppressive acts of manufacturers constitutes a legitimate public purpose. *See, e.g., Fireside Nissan, Inc. v. Fanning,* 30 F.3d 206, 218 (1st Cir. 1994) (analyzing argument that Rhode Island automobile dealership law violated the dormant Commerce Clause and explaining that "the state's desire to protect local dealers and consumers from harmful franchising practices is a lawful legislative goal"); *Am. Motor Sales v. Div. of Motor Vehicles, Etc.,* 592 F.2d 219, 222-23 (4th Cir. 1979) (addressing dormant Commerce Clause claim and concluding that a "Virginia statute regulating the establishment of new automobile franchises serves a legitimate local purpose" because it fulfills the same interests identified by the Court in *New Motor Vehicle Board of California*); *Acadia Motors, Inc. v. Ford Motor Co.,* 844 F. Supp. 819, 827-28 (D. Me. 1994) (in contract clause case, determining that Maine had significant and legitimate interests in rectifying "[t]he disparity in bargaining power between automobile manufacturers and their dealers" and in protecting dealers from abusive and oppressive manufacturer practices), *affirmed in part and reversed in part on other grounds,* 44 F.3d 1050 (1st Cir. 1995); *Mon-Shore Management, Inc. v. Family Media, Inc.,* 584 F. Supp. 186, 191 (S.D.N.Y. 1984) (rejecting dormant Commerce Clause claim and concluding that New York had "a valid interest in protecting prospective franchisees from unscrupulous franchisors" and that the "protection of investors" is a legitimate state objective); *General Motors v. Motor Vehicle Review Bd.,* 862 N.E.2d 209, 229 (Ill. 2007) (in the context of an equal protection claim, concluding that Illinois statute is rationally related to the "legitimate government purposes of redressing the disparity in bargaining power between automobile manufacturers and their existing dealers and of protecting the public from the negative impact of harmful franchise practices by automobile manufacturers"); *Anderson's Vehicle Sales, Inc. v. OMC-Lincoln,* 287 N.W.2d 247, 250 (Mich. Ct. App. 1979) (in a contract clause case, finding "that the Legislature has the power to regulate the potential inequities inherent in the relationship between manufacturers and dealers of motor vehicles").

Relying upon *Equipment Manufacturers Institute v. Janklow,* 300 F.3d 842, 861 (8th Cir. 2002), the Deere petitioners and Husqvarna argue that protecting equipment dealers "from perceived abusive and oppressive acts by . . . manufacturers," *New Motor Vehicle Bd. of Cal.,* 439 U.S. at 101, is not a significant and legitimate public purpose. In *Janklow,* equipment

manufacturers, including Deere and AGCO, sought a declaration that a 1999 amendment to a South Dakota law governing the relationships between such manufacturers and their dealers violated the federal Contract Clause because it substantially impaired their pre-existing dealership contracts. *Janklow*, 300 F.3d at 847, 848. The State conceded that the purpose of the South Dakota law was to "level the playing field between manufacturers and dealers." *Id.* at 860. The Eighth Circuit Court of Appeals held that "leveling the playing field between contracting parties is expressly prohibited as a significant and legitimate public interest." *Id.* at 861.

 *Janklow* is distinguishable because SB 126 has a broader purpose "than a simple reallocation of existing contractual rights." *Gwadosky*, 430 F.3d at 43 (discussing Maine law that precludes motor vehicle manufacturers from recovering from dealers their costs for warranty repairs). SB 126, like the Maine statute at issue in *Gwadosky*, "aspires to protect consumers as well as dealers." *Id.*; *see* N.H.H.R. JOUR. 765 (May 22, 2013). The legislature was specifically concerned that manufacturers shifted costs "onto dealers and ultimately consumers" through the use of "one-sided, non-negotiable contracts." N.H.H.R. JOUR. 765 (May 22, 2013). That rationale brings SB 126 "squarely within the category of remedies to generalized social or economic problems that constitute legitimate subjects for legislation, notwithstanding the imperatives of the Contracts Clause." *Gwadosky*, 430 F.3d at 43; *see Greenwood Trust Co. v. Com. of Mass.*, 971 F.2d 818, 828 (1st Cir. 1992) (describing "consumer protection" as a "subject[ ] over which the states have traditionally exercised their police powers").

In *Janklow*, the court also concluded that "the only real beneficiaries" under the South Dakota law were "the narrow class of dealers of agricultural machinery," and that "such special interest legislation runs afoul of the Contract Clause when it impairs pre-existing contracts." *Janklow*, 300 F.3d at 861. The Deere petitioners argue that, like the law at issue in *Janklow*, SB 126 constitutes special interest legislation.

To support this argument, they rely upon *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978). Their reliance upon *Allied Structural Steel* is misplaced. At issue in *Allied Structural Steel* was whether the application of Minnesota's Private Pension Benefits Protection Act to Allied Structural Steel violated the Federal Contract Clause. *Allied Structural Steel*, 438 U.S. at 236. Under the act, "a private employer of 100 employees or more — at least one of whom was a Minnesota resident — who provided pension benefits under a plan meeting the qualifications of § 401 of the Internal Revenue Code, was subject to a 'pension funding charge' if [the employer]

either terminated the plan or closed a Minnesota office." *Id.* at 238. In concluding that the act lacked a significant and legitimate public purpose, the Court observed that the act "was not even purportedly enacted to deal with a broad, generalized economic or social problem." *Id.* at 250. Rather, it had "an extremely narrow focus," applying only to certain private employers with 100 employees or more, at least one of whom was a Minnesota resident. *Id.* at 248. "Indeed," as the Court observed in a later case, the act "even may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired." *Energy Reserves Group,* 459 U.S. at 412 n.13; *see Allied Structural Steel,* 438 U.S. at 247-48, 248 n.20.

 The same cannot be said of SB 126. SB 126 was expressly enacted to address "a broad, generalized economic or social problem." *Allied Structural Steel,* 438 U.S. at 250; *see* N.H.H.R. JOUR. 765 (May 22, 2013); *see also Gwadosky,* 430 F.3d at 43. The State has a significant and legitimate interest in protecting equipment dealers from "perceived abusive and oppressive acts by the manufacturers." *New Motor Vehicle Bd. of Cal.,* 439 U.S. at 101. As one court explained, eliminating unfair methods of competition and unfair and deceptive practices can foster "a salubrious and more stable business climate" for all businesses, "thus aiding the state economy" and providing a "secondary benefit that inures to . . . consumers." *N.A. Burkitt, Inc. v. J.I. Case Co.,* 597 F. Supp. 1086, 1092 (D. Me. 1984); *cf. Sanitation and Recycling Industry v. City of N.Y.,* 107 F.3d 985, 994 (2d Cir. 1997) (concluding that "eradicating the vestiges of criminal control accompanied by bid-rigging, 'evergreen' contracts and predatory pricing in the carting industry," constitutes a "broad societal goal, not the pursuit of the interests of a narrow class").

The Deere petitioners argue that we cannot view legislative history to determine whether SB 126 has a significant and legitimate public purpose; however, their argument conflates our general principles of statutory interpretation with our inquiry under the State and Federal Contract Clauses. Although generally, when interpreting a statute, we consider legislative history only when statutory language is ambiguous, *see ATV Watch v. N.H. Dep't of Transp.,* 161 N.H. 746, 752 (2011), that principle does not apply here. Here, we are not interpreting SB 126, but rather are determining whether the legislature had a significant and legitimate public purpose for enacting the statute. Indeed, the Deere petitioners have not cited any cases, and we are not aware of any, that stand for the proposition that a court is precluded from examining a statute's legislative history when analyzing whether it offends the State or Federal Contract Clause.

■ Husqvarna contends that we must find that the legislature lacked a significant and legitimate purpose for enacting SB 126 because, to the extent that it found the relationship between car/truck dealers and manufacturers to be identical to that between yard and lawn equipment dealers and manufacturers, its finding is unsupportable and was made in an "evidentiary vacuum." However, it is not our role to second-guess this legislative determination. Although our review in a contract clause case involving purely private contracts is not identical to rational basis review in the equal protection or due process context, it is similar. *See* Burnham, *Public Pension Reform and the Contract Clause: A Constitutional Protection for Rhode Island's Sacrificial Economic Lamb*, 20 ROGER WILLIAMS U. L. REV. 523, 537-38 (Summer 2015) (discussing differences between rational basis review and review in a contract clause case); *see also* E. CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 8.3.3, at 652 (4th ed. 2011) (when government is not a contracting party, describing contract clause analysis as similar to "traditional rational basis review"). As with rational basis review in other contexts, when examining, for contract clause purposes, whether the legislature had a significant and legitimate public purpose for enacting a law, we will not require of the legislature "courtroom factfinding" and will uphold a legislative choice "based on rational speculation." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (discussing rational basis review in an equal protection case).

To the extent that Husqvarna argues that, for public policy reasons, equipment manufacturers, such as itself, should not be subject to the mandates of RSA chapter 357-C, this must be accomplished by legislative action and not by judicial decree.

■ Although Kubota asserts that the public policy underlying SB 126 is not legitimate because it was not a response to an emergency, we disagree. An emergency need not exist before a state may enact a law that impairs a private contract. *Energy Reserves Group*, 459 U.S. at 412 (explaining that, to be legitimate, "the public purpose need not be addressed to an emergency or temporary situation").

### 2. Reasonableness and Necessity

■ "Upon finding a legitimate public purpose, the next step . . . involves ascertaining the reasonableness and necessity of the adjustment of contract obligations effected by the regulation to determine finally whether the regulation offends the Contract Clause." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999). However, "when the contracts at issue are private and no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise

serve its own pecuniary interests . . . , a court properly may defer to the legislature's judgment." *Id.*; *see Energy Reserves Group*, 459 U.S. at 412-13. As the Supreme Court explained in *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 505 (1987), although "the finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations," and although "[a] court must . . . satisfy itself that the legislature's adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption, . . . *unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.*" (Quotations, brackets, and citations omitted; emphasis added.)

Here, SB 126 "plainly survives scrutiny" under the standards for evaluating impairments of purely private contracts. *Keystone Bituminous Coal Assn.*, 480 U.S. at 506. The legislature has determined that, to prevent equipment manufacturers from engaging in abusive and oppressive acts with their dealers, it must subject them to the same level of regulation that it imposes upon automobile manufacturers. *See* N.H.H.R. JOUR. 765 (May 22, 2013). Thus, as a result of SB 126, equipment manufacturers are specifically precluded from engaging in methods of competition and practices that the legislature has deemed unfair and deceptive. *See* RSA 357-C:3. To deter them from engaging in such conduct, the legislature has made a violation of any provision of RSA chapter 357-C a misdemeanor. *See* RSA 357-C:15. Additionally, among other regulations, equipment manufacturers are precluded from adding dealerships to the market areas of existing franchises when "it is injurious . . . to the public welfare" to do so, RSA 357-C:9, II(c). *See New Motor Vehicle Bd. of Cal.*, 439 U.S. at 102 (describing California Automobile Franchise Act). As a result of SB 126, to enforce this prohibition, an equipment manufacturer proposing to establish a new dealership in a dealer's relevant market area, must give prior notice of its intention to the Board and to other dealers of the same "line make" in the same market area. RSA 357-C:9, I; *see New Motor Vehicle Bd. of Cal.*, 439 U.S. at 103 (describing California Automobile Franchise Act).

The provisions of RSA chapter 357-C, as applied to equipment manufacturers through SB 126, reasonably accomplish the legislature's goal of preventing equipment manufacturers from engaging in abusive and oppressive trade practices. Because the contracts at issue are private and, thus, there is no danger that the State is using its regulatory power to serve its own pecuniary interests, we "refuse to second-guess" the legislature's determination that including equipment manufacturers within the aegis of

RSA chapter 357-C was a reasonable and necessary way to address its concern. *Keystone Bituminous Coal Assn.*, 480 U.S. at 506; *see Houlton Citizens' Coalition*, 175 F.3d at 191; *see also Sanitation and Recycling Industry*, 107 F.3d at 994 (observing that "[w]hen reviewing a law that purports to remedy a pervasive economic or social problem," the court's "analysis is carried out with a healthy degree of deference to the legislative body that enacted the measure"). To the extent that *Tuttle* can be read to require that we conduct a more searching inquiry with regard to the reasonableness and necessity of SB 126, we note that our inquiry in *Tuttle* was more exacting than our inquiry here because, unlike SB 126, the legislation in *Tuttle* inured to the State's financial benefit.

For all of the foregoing reasons, therefore, we hold that the petitioners have not sustained their burden of establishing that SB 126 offends the State Contract Clause. Because the Federal Constitution affords the petitioners no greater protection than does the State Constitution in these circumstances, *see Energy Reserves Group*, 459 U.S. at 411-13; *Gwadosky*, 430 F.3d at 43; *Houlton Citizens' Coalition*, 175 F.3d at 191, we reach the same conclusion under the Federal Constitution as we do under the State Constitution.

## C. Supremacy Clause

The Deere petitioners argue that, as applied to equipment manufacturers, portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III conflict with the Federal Arbitration Act (FAA) and, therefore, violate the Supremacy Clause of the Federal Constitution. RSA 357-C:3, III(p)(3) provides, in relevant part, that it is "an unfair method of competition and unfair and deceptive practice" for any manufacturer to "[r]equire a motor vehicle franchisee to agree to a term or condition in a franchise . . . as a condition to the offer, grant, or renewal of the franchise . . . or agreement, which . . . [r]equires that disputes" between the franchisor and the franchisee "be submitted to arbitration." RSA 357-C:3, III(p)(3) specifically allows arbitration if the franchisor and franchisee "agree to submit the dispute to arbitration . . . at the time the dispute arises." RSA 357-C:6, III provides, in relevant part, that any provision in a new dealership agreement, including an arbitration provision, that "denies or purports to deny access to the procedures, forums, or remedies provided for by [New Hampshire] laws or regulations" shall be deemed void and unenforceable.

The Deere petitioners assert that, as applied to equipment manufacturers, these portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III conflict with the FAA because they limit the applicability of an arbitration clause. *See Preston v. Ferrer*, 552 U.S. 346, 359 (2008) (holding that "[w]hen parties agree to arbitrate all questions arising under a contract, the FAA

supersedes state laws lodging primary jurisdiction in another forum, whether judicial or administrative"); *see also Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 353 (E.D.N.Y. 2013) (deciding that New York provision similar to RSA 357-C:3, III(p)(3) conflicts with the FAA).

The Deere petitioners acknowledge that these portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III, as applied to certain other manufacturers, do not conflict with the FAA because those manufacturers are subject to a federal law that provides, in relevant part: "Notwithstanding any other provision of law, whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy." 15 U.S.C. § 1226(a)(2) (2012); *see Champion Auto Sales, LLC*, 943 F. Supp. 2d at 354. The Deere petitioners contend that this exception to the FAA applies only to manu-facturers of "motor vehicle[s]," as defined by 49 U.S.C. § 30102(a)(6) (2012), *see* 15 U.S.C. § 1226(a)(1) (2012), and argue that they and other equipment dealers are not "motor vehicle" manufacturers. *See Champion Auto Sales, LLC*, 943 F. Supp. 2d at 354 (concluding that snowmobiles, all-terrain vehicles, and low-speed vehicles were not subject to 15 U.S.C. § 1226(a)(2) because such vehicles do not constitute "motor vehicle[s]" under 49 U.S.C. § 30102(a)(6)).

The trial court agreed with the Deere petitioners that, as applied to equipment manufacturers, the challenged portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III are preempted by the FAA, but concluded that they are also severable from the remaining provisions of RSA chapter 357-C. Because the trial court's preemption determination has not been appealed, the only issue before us is the severability of the challenged provisions.

██ ██ In determining whether the valid provisions of a statute are severable from the invalid ones, we presume that the legislature intended that the invalid part shall not destroy the validity of the entire statute. *See Associated Press v. State of N.H.*, 153 N.H. 120, 141 (2005). We then examine "whether the unconstitutional provisions of the statute are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the structure" of the statute. *Id.* (quotation omitted). Based upon our review of the entire statutory scheme, of which the challenged portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III are but a small part, we conclude

that those portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III are severable from the remaining provisions of RSA chapter 357-C.

The Deere petitioners argue that the challenged portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III are inseparable from the numerous provisions in RSA chapter 357-C that pertain to administrative proceedings before the Board (the Board provisions). They contend that the Board provisions "manifest a legislative understanding (or, in this case, a legislative misunderstanding) that the contracts RSA [chapter] 357-C regulates are exempt from the FAA." They argue that those provisions demonstrate that RSA chapter 357-C "is not designed to regulate contractual relationships under which pre-dispute arbitration agreements are enforceable." Accordingly, they assert, because the Board provisions are integral to RSA chapter 357-C, the entire chapter, as applied to "equipment dealership agreements that contain pre-dispute mandatory arbitration agreements," is invalid. We are not persuaded that the challenged portions of RSA 357-C:3, III(p)(3) and RSA 357-C:6, III are inextricably linked to the Board provisions in RSA chapter 357-C, and, thus, we reject this argument. To the extent that the Deere petitioners assert that the Board provisions themselves conflict with the FAA and, therefore, are void under the Supremacy Clause, we conclude that they have not developed this argument sufficiently for our review. *See In re G.G.*, 166 N.H. 193, 197 (2014).

Husqvarna requests that we "foreclose any uncertainty as to the effect of the Superior Court's Order on Husqvarna's arbitration rights" by holding that "a dealer with an agreement containing an arbitration clause . . . may not resort to the Board for resolution of any dispute arising under or in connection with the dealer relationship." We decline this request without prejudice to Husqvarna raising this argument in any future litigated case between it and a dealer.

## D. Husqvarna's Separate Federal Constitutional Claims

We next address the two constitutional claims that Husqvarna alone asserts: (1) that the trial court erred by determining that SB 126 does not violate Husqvarna's rights under the Federal Equal Protection Clause; and (2) that the trial court erred by ruling that SB 126, as applied to Husqvarna, does not violate the dormant Commerce Clause of the Federal Constitution.

### 1. Equal Protection Clause

Husqvarna argues that SB 126 violates the Federal Equal Protection Clause because it amends the definition of "motor vehicle" in RSA chapter 357-C to include yard and garden equipment. Husqvarna contends that including such equipment in the statutory definition of "motor vehicle" is arbitrary and irrational, in violation of its equal protection rights. *See*

*Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). However, Husqvarna concedes that it does not allege that it has been treated differently from any other similarly situated manufacturer. In its brief, Husqvarna explains: "It is not treatment different from other manufacturers of this equipment that violates Husqvarna's constitutional rights," but, rather, "the arbitrary and irrational classification of Husqvarna as a manufacturer of 'motor vehicles' that deprives Husqvarna of equal protection."

The Supreme Court "has long held that a classification neither involving fundamental rights nor proceeding along suspect lines cannot run afoul of the Equal Protection Clause if there is a rational relationship between the [classification] and some legitimate governmental purpose." *Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2080 (2012) (quotation and ellipsis omitted). The Court has "made clear . . . that, where ordinary commercial transactions are at issue, rational basis review requires deference to reasonable underlying legislative judgments." *Id.* (quotation omitted). The classification at issue here, including yard and garden equipment in the statutory definition of motor vehicle, *see* RSA 357-C:1, I, involves neither a fundamental right nor a suspect class. *See Armour*, 132 S. Ct. at 2080. "Its subject matter is . . . economic, social, and commercial." *Id.* As Husqvarna apparently concedes by not arguing otherwise, we, therefore, apply rational basis review. *See id.*

Under rational basis review, "a law [is] constitutionally valid if there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render [the classification] arbitrary or irrational." *Id.* (quotation omitted). The legislature is deemed to have had "a plausible reason if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quotation omitted). "Moreover, . . . we are not to pronounce [a] classification unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." *Id.* (quotation and brackets omitted). Because the classification is presumed constitutional, Husqvarna has the burden "to negative every conceivable basis which might support" classifying yard and garden equipment as motor vehicles under RSA chapter 357-C. *Id.* at 2080-81.

■ For all of the reasons that we have discussed previously in relation to the petitioners' contract clause claim, we hold that Husqvarna has failed to establish that classifying yard and garden equipment as motor vehicles for the purposes of RSA chapter 357-C is not rationally related to the legislature's legitimate purpose of protecting the dealers of such equipment from perceived abusive and oppressive acts by manufacturers. *See New Motor Vehicle Bd. of Cal.*, 439 U.S. at 101.

### 2. Dormant Commerce Clause

■ Husqvarna next argues that SB 126 violates the dormant Commerce Clause of the Federal Constitution. The Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. "That grant embodies a negative aspect as well — the 'dormant Commerce Clause' — which prevents state and local governments from impeding the free flow of goods from one state to another." *Gwadosky*, 430 F.3d at 35 (quotation omitted). "Put another way, the dormant Commerce Clause prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (quotation omitted).

■ "The type of inquiry needed to determine whether a state law transgresses the [dormant] Commerce Clause varies depending upon the nature of the law at issue." *Id.* "A state statute that purports to regulate commerce occurring wholly beyond the boundaries of the enacting state outstrips the limits of the enacting state's constitutional authority and, therefore, is per se invalid." *Id.* "A state statute that has no direct extraterritorial reach but that discriminates against interstate commerce on its face, in purpose, or in effect receives a form of strict scrutiny so rigorous that it is usually fatal." *Id.* "[S]uch a statute is invalid unless it advances a legitimate local purpose that cannot be served by reasonable non-discriminatory means." *Id.* "The state bears the burden of showing legitimate local purposes and the lack of non-discriminatory alternatives, and discriminatory state laws rarely satisfy this exacting standard." *Family Winemakers of California v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

By contrast, a state statute that "regulates evenhandedly and has only incidental effects on interstate commerce" engenders a lower level of scrutiny. *Gwadosky*, 430 F.3d at 35 (quotation omitted). Such a statute "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* (quotation omitted); *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Husqvarna does not argue, nor could it argue, that SB 126 discriminates against out-of-state manufacturers on its face. Instead, Husqvarna argues

that SB 126 has a discriminatory purpose and/or effect. Husqvarna reasons that SB 126 violates the dormant Commerce Clause because the State has "not articulated a legitimate public interest in economically favoring New Hampshire dealers over out-of-state manufacturers." *See Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 342 (1992) (explaining that the State has the burden to justify a discriminatory statute "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake").

To support its assertion that SB 126 has a discriminatory purpose, Husqvarna relies upon two isolated statements, one by a member of the Nashua Chamber of Commerce at a public hearing on SB 126 that "It's them vs. out-of-state manufacturers," and the other by the sponsor of SB 126 that "New Hampshire businesses should have the right to do business with New Hampshire businesses." We agree with the trial court that Husqvarna has failed to sustain its burden of showing a discriminatory purpose.

██ "Where, as here, a party presents circumstantial evidence of an allegedly discriminatory purpose in support of a dormant Commerce Clause argument, it is that party's responsibility to show the relationship between the proffered evidence and the challenged statute." *Gwadosky,* 430 F.3d at 39. "While statements by a law's private-sector proponents sometimes can shed light on its purpose, the [statement] of a single lobbyist has little (if any) probative value in demonstrating the objectives of the legislative body as a whole." *Id.* (citation omitted). An isolated statement by the bill's sponsor during a floor debate on a failed amendment likewise has little probative value regarding the legislature's intent in enacting the bill. *Cf. Appeal of Reid,* 143 N.H. 246, 253 (1998) (cautioning against "imputing too much weight to comments of proponents of bills offered in legislative committee hearings" (quotation omitted)). "This is particularly so when, as in this case, far stronger statements of intent can be gleaned from official legislative sources." *Gwadosky,* 430 F.3d at 39.

██ Husqvarna next asserts that SB 126 has a discriminatory effect. For the purposes of the dormant Commerce Clause analysis, "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.,* 511 U.S. 93, 99 (1994) (quotation omitted). The "differential treatment" must be between entities that are similarly situated. *See General Motors Corp. v. Tracy,* 519 U.S. 278, 298-99 (1997); *see also National Ass'n of Optometrists & Opt. v. Brown,* 567 F.3d 521, 525, 527-28 (9th Cir. 2009).

Husqvarna contends that SB 126 has a discriminatory effect "because it insulates in-state dealers from intrabrand competition while Husqvarna must pursue a lengthy administrative process." Husqvarna argues that because it must now seek a finding of the Board before it puts a new dealer into another dealer's territory or before it relocates a dealer, it is more burdensome for it to do business in New Hampshire than elsewhere.

We agree with the trial court that Husqvarna has failed to satisfy its burden of showing discriminatory effect. Husqvarna has not presented any evidence regarding the effects of SB 126 upon similarly situated entities. Equipment dealers and manufacturers are not similarly situated. Accordingly, Husqvarna cannot meet its burden of demonstrating that SB 126 has a discriminatory effect by comparing its effect upon New Hampshire dealers against its effect upon Husqvarna.

Nor can Husqvarna meet its burden of establishing that SB 126 has discriminatory effect by alleging, upon information and belief, that "none of [its] competitors for [yard and garden equipment] has a facility in New Hampshire where [such] equipment . . . is manufactured." That allegation, even if true, cannot establish discrimination as between in-state and out-of-state equipment manufacturers. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126, n.16 (1978) (explaining that discrimination under the dormant Commerce Clause occurs when "the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market"); *see also Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36, 38 (1st Cir. 2007) (concluding that plaintiffs had failed to show discriminatory effect of Maine law, which allowed only "farm" wineries to sell directly to consumers, absent any evidence that out-of-state wineries suffered any disproportionate loss of business, that Maine law acts to protect Maine wineries, or that Maine consumers even purchase wine directly from Maine vineyards).

In its reply brief, Husqvarna likens this case to *Yamaha Motor Corp. v. Jim's Motorcycle*, 401 F.3d 560 (4th Cir. 2005), and argues that the analysis used in that case should apply here. In *Yamaha*, a Virginia statute gave an existing motorcycle dealer the "right to protest the establishment of a new dealership for the same line-make (brand) in its 'relevant market area,' defined as a seven to ten-, fifteen-, or twenty-mile radius around the existing dealer, depending on population density." *Yamaha*, 401 F.3d at 563. This statutory provision had previously been upheld against a dormant Commerce Clause challenge. *See Am. Motor Sales*, 592 F.2d at 220-24.

The dispute in *Yamaha* concerned a second statutory provision that allowed "*[a]ny existing franchise dealer*," regardless of its relevant market

area, to file a protest whenever any "new or additional motorcycle dealer franchise" was "established in any county, city or town" in Virginia. *Yamaha*, 401 F.3d at 563-64 (quotations omitted). This provision, the court explained, allowed "an existing dealer at one end of Virginia" to "protest a proposed dealership some 500 miles away at the other end of the state." *Id.* at 573. The court determined that the second statutory provision was not discriminatory on its face, in its purpose, or in effect. *Id.* at 568-69.

However, the court invalidated the second statutory provision under the so-called *Pike* balancing test. *Id.* at 569-74. Under that test, the court weighs the putative local benefits of the statute against its burden upon interstate commerce, and invalidates the statute only when the burdens clearly outweigh the benefits. *See Pike*, 397 U.S. at 142. "A statute need not be perfectly tailored to survive *Pike* balancing, but it must be reasonably tailored: the extent of the burden that will be tolerated depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Yamaha*, 401 F.3d at 569 (quotation, ellipsis, and brackets omitted). In determining whether a statute has "a legitimate local purpose" and "putative local benefits," a court defers to the state legislature. *Yamaha*, 401 F.3d at 569 (quotations omitted). "Courts are not inclined to second-guess the empirical judgments of lawmakers concerning the utility of legislation." *Id.* (quotation omitted). "The *Pike* test requires closer examination, however, when a court assesses a statute's burdens, especially when the burdens fall predominantly on out-of-state interests." *Id.*

Although Husqvarna raised its *Pike* balancing test argument in its objection to the State's cross-motion for summary judgment, the trial court did not address it. Because the *Pike* balancing test is "fact-intensive," we decline to address Husqvarna's argument in the first instance. *United Haulers v. Oneida-Herkimer Solid Waste*, 261 F.3d 245, 264 (2d Cir. 2001); *see Lebanon Farms Disposal, Inc. v. County of Lebanon*, 538 F.3d 241, 251-52 (3d Cir. 2008); *see also National Ass'n of Optometrists & Opt.*, 567 F.3d at 528. "In its present form, the record is incomplete regarding the burden on interstate commerce and, more importantly, the putative local benefits," and we lack the benefit of the trial court's findings of fact and conclusions of law on these issues. *Lebanon Farms Disposal, Inc.*, 538 F.3d at 252. Therefore, we vacate the trial court's order granting summary judgment to the State on Husqvarna's dormant Commerce Clause claim and remand for the court to consider whether RSA chapter 357-C, as amended by SB 126, passes constitutional muster under the *Pike* balancing

test. *See National Ass'n of Optometrists & Opt.*, 567 F.3d at 528; *see also United Haulers*, 261 F.3d at 263-64; *Lebanon Farms Disposal, Inc.*, 538 F.3d at 251-52.

*III. Conclusion*

In sum, we uphold SB 126 against the petitioners' claims that it violates the State and Federal Contract Clauses. The trial court's decision that the challenged portions of RSA 357-C:3, III (p)(3) and RSA 357-C:6, III are preempted has not been appealed. We agree with the trial court that the preempted provisions are severable from the remaining provisions of RSA chapter 357-C as applied to the petitioners. We reject Husqvarna's argument that SB 126 violates the Equal Protection Clause of the Federal Constitution. We also reject Husqvarna's contention that SB 126 has either a discriminatory purpose or effect within the meaning of the dormant Commerce Clause. Nonetheless, we vacate the trial court's grant of summary judgment to the State on Husqvarna's dormant Commerce Clause claim and remand for the trial court to consider, in the first instance, whether SB 126 is unconstitutional under the *Pike* balancing test.

2014-0315 *Affirmed*;
2014-0441 *Affirmed*;
2014-0575 *Affirmed in part*;
*vacated in part; and*
*remanded.*

HICKS, CONBOY, and LYNN, JJ., concurred.